## EXCHANGE BANK v. McDILL.

SURETY—APPLICATION OF PAYMENTS.—As against a surety who executed a bond to indemnify a bank for overdrafts of his principal in a cotton account for a particular season, the bank cannot apply to another account of the principal, the proceeds of drafts drawn in favor of the cotton account, then dishonored, but afterwards collected by suit. *Pelzer, Rodgers & Co.* v. *Steadman,* 22 S. C., 284, *distinguished from this.*

Before GARY, J., York, April, 1899. Affirmed.

Foreclosure by Exchange Bank and Joseph F. Wallace, surviving liquidator, against J. N. McDill and M. J. Clark.

The Circuit decree, omitting formal portions and statements of testimony, is as follows:

The testimony reported by the special referee is so voluminous and the exceptions raise so many questions of fact, that I find it difficult to frame an intelligent decree by simply passing upon the various exceptions taken to the report. I have, therefore, for this reason concluded to pass upon the issues raised by the pleadings, believing that the equities of the parties can be better and more satisfactorily determined in that manner, and that is the object sought by both parties. It appears from the testimony adduced before the referee that the mercantile firm of J. W. P. Hope & Co. did a considerable banking business with the plaintiff bank, extending over and embracing a period of several years. It also appears that J. M. Hope, a member of the firm of J. W. P. Hope & Co. and as an individual, likewise had considerable dealings with said bank. The firm of J. W. P. Hope & Co. was engaged in the business of buying cotton in the city of Yorkville, S. C., and the said J. M. Hope was engaged in a similar business outside of Yorkville on his individual account. It also appears that the plaintiff bank, during the year 1889, for its protection, required a bond of indemnity in the sum of $2,000 either from the firm of J. W. P. Hope & Co. or from John M. Hope individually, with the defendant, James N. McDill, as surety, to indemnify and save harmless said bank against any loss that it might sustain by overdraft that might be drawn by either J. W. P. Hope & Co. or John M. Hope individually. This bond unfortunately has been lost. And to that fact is due one of the material issues in this case. The bank on the one hand contends that it was the bond of J. W. P. Hope & Co., and the defendants contend that it was the bond of John M. Hope individually, with James N. McDill as surety. It will be seen at once that this is a serious question of fact as affects his liability. * * * The referee, in passing upon this question, uses this language: "There is a conflict of testimony as to whether John M. Hope or J. W. P. Hope & Co. was the principal of this bond, signed by Mc-

Dill as surety, in September, 1889. John M. Hope testifies positively that it was John M. Hope. McDill says he is not positive, but thinks it was J. W. P. Hope & Co. There is in evidence a bond of a similar nature signed John M. Hope and J. B. Pegram, dated the same fall, and it seems inconsistent to be substituting a note of J. W. P. Hope & Co., with Mc-Dill as surety, for a bond of John M. Hope, with McDill as surety—the bond to secure the account of John M. Hope and the note to secure the account of J. W. P. Hope & Co." In this finding I agree with the special referee, and especially so since the witnesses all agree that the note was to be a substitute for the bond.

We shall now deal with this note as being a substitute for the bond to secure the cotton account of J. W. P. Hope & Co., and not the individual account of John M. Hope, and test the liability of James N. McDill, the surety, from that standpoint. * * * It will be seen from the testimony that the overdrafts (as they appear from the books of the bank) on the cotton transaction of said bank with Hubbard, Price & Co. amounted to $8,150, and as to this transaction the plaintiffs and the defendants have a wide difference. It is insisted on the part of the bank that the substituted note secured by the mortgage of James N. McDill, and sought in this action to be foreclosed, should not only cover any deficiency that might arise on the cotton transaction with Hubbard, Price & Co., but it is also claimed that under the agreement of the parties it was also intended and agreed that it should cover any balance that might be due the bank by J. W. P. Hope & Co. on open account with said bank. In other words, that it was to cover any deficiency that might exist after striking a balance on the account of J. W. P. Hope & Co. with said bank. It, therefore, becomes necessary, in the absence of the bond, to review the testimony on this point. At the close of the reference the plaintiffs offered in evidence without objection a bond signed by John M. Hope and J. B. Pegram, dated 24th September, 1889, marked Exhibit "D D." The referee finds that this bond of

J. M. Hope and J. B. Pegram is of a similar nature to the bond of J. W. P. Hope & Co. and James N. McDill. If this be true, then we can ascertain from the bond itself what liability it was intended to secure. In the Pegram bond the condition is to pay the full amount of any overdrafts that he may make upon his account as kept at said Exchange Bank during the cotton season just opening, as soon as the balance is properly struck and demand for payment is made, etc. If the McDill bond was similar to this, then it is clear that the security is limited to overdrafts that might be made during the "cotton season just opening." In other words, the bond was limited or conditioned to secure a future and not a past liability of the firm of J. W. P. Hope & Co. And if that be the case, the bank could only claim from James N. McDill an indemnity for a loss it might have sustained on overdrafts on the cotton account of J. W. P. Hope & Co., and not upon an open account past due, as contended for. It seems to me that the bank has put this construction on the agreement. Mr. Wallace states that he knew of the transaction of Hubbard, Price & Co. and J. W. P. Hope & Co. That the transaction resulted in a temporary loss to the bank. The net recovery was the sum of $8,526.26, and was turned over to Mr. Wallace, the surviving liquidator, on the 11th of April, 1896. When Mr. Wallace heard that the bank had re-recovered this amount, he immediately wrote to Mr. McDill, notifying him of the fact, and had a conversation with Mr. Hope about it. He does not remember what he wrote. Mr. Hope testified: "After the recovery and the money received, on Monday or Tuesday following, Mr. Wallace came down and told me that money had been received. I told him I was surprised that he had not notified me sooner. We discussed the matter of telegraphing Mr. McDill. He then told me he had already notified him on Saturday, and told him he was released. We then had some conversation as to whether he would send the papers to Mr. McDill or I would do so." The defendant, McDill, testified: "That when Hubbard, Price & Co. had failed to honor

the drafts, that Mr. Wallace wrote to him to come up and secure the note. I came up the next day after getting the last letter. I went to his office and talked a short while with him. He asked me if I had come up to fix that matter. I told him I had. He remarked that he was sorry that the loss · had occurred—this cotton, the cotton shipped to Hubbard, Price & Co. by John M. Hope—that it would leave me to pay the note, and that their loss would be heavy, too, from eight to ten thousand dollars, may be more. Don't know that he talked about indemnity. Said I would have to secure them. Mr. Wallace said he considered it a complete loss; that I might count on having it to pay. I told him I would give him the papers to secure it. He fixed up the mortgage, Exhibit 'B,' and I signed it. The next communication I received from Mr. Wallace was a postal card received 11th April, 1896. I have made diligent search for it and cannot find it. On that postal he congratulated me on the result of the case of the bank against Hubbard, Price & Co.—said I would be relieved, and my papers would be sent me in a few days. I showed that postal to Mr. J. K. Allison, my son Thomas McDill, my son Nixon and my wife and daughter. I showed it because I rejoiced over the good news, etc."

Up to that time, although the bank had received this money on account of the unpaid drafts of Hubbard, Price & Co., it seems it had not applied the same to these drafts. Mr. Wallace testifies: "I had not made any application of the money prior to the meeting of the stockholders which adopted the resolutions. The credits on the books and the notes were actually put on the books and notes after the passage of the resolutions by the stockholders, but were credited to take effect as of day money was received." The resolution reads as follows: "That the surviving liquidator, James F. Wallace, be directed that the amount that should be credited to the indebtedness of J. W. P. Hope & Co. to this bank derived from the verdict in the case of Exchange Bank *v.* Hubbard, Price & Co., and the amount awarded to J. M. Hope by recent resolutions of the stockholders, be applied to

the note of J. W. P. Hope & Co. due this bank, and the balance, if any, to the open account of said firm." Now it seems to me that this resolution is an afterthought on the part of the bank. If the contract of McDill was as the bank contends, why was not the credit applied in the usual course of business? Why was a resolution necessary? It seems to me that Mr. Wallace, who drew this mortgage, had in his mind at the time only the dishonored drafts drawn on Hubbard, Price & Co., and it was his sole purpose at the time to secure the bank for those drafts to the amount of $2,000, the liability of McDill, and when the bank recovered that amount of the unhonored drafts from Hubbard, Price & Co., it was its duty in equity and good conscience to so credit them. Their failure to honor those drafts was the basis of the cause of action in which the bank recovered. In other words, they were forced by the law to honor the drafts or to do what amounted to the same thing, pay the damage or loss to the bank for their failure to honor them. Such being the case, the bank cannot be said to have been damaged by "any overdraft on the account of J .W. P. Hope & Co. during the cotton season just opening." And consequently it has no cause of action against the surety, the defendant, James N. McDill.

For the foregoing reason I sustain the conclusion of the referee, that the complaint be dismissed as to the defendant, James N. McDill.

The plaintiffs appeal on the following exceptions:

I. For error of fact in not finding that when the note in suit was substituted for the bond of J. W. P. Hope & Co. and J. N. McDill, that there was an existing liability under the bond of at least $2,000, which remains wholly unpaid.

II. For error of fact in not finding that J. N. McDill knew of, agreed to, and participated in the compromise of Hope & Co. with the bank, and so waived performance by the bank of any obligation in law or in fact it might otherwise have been under to him to apply the proceeds of the drafts on Hubbard, Price & Co., as claimed by him.

III. For error of law in failing to find that McDill, by executing and delivering to the bank a mortgage to secure his note to the bank, reaffirmed his liability to the bank, as well as affirmed the compromise of Hope & Co. with the bank.

IV. For error of fact in failing to find that there is still an overdraft on the account of J. W. P. Hope & Co. with Exchange Bank (so far as McDill is concerned) of $3,851.38, with interest from April 11th, 1896, upon which McDill is liable as surety.

V. For error of law in holding that the bank was bound in equity and good conscience to credit the proceeds of the Hubbard, Price & Co. drafts on the open account of J. W. P. Hope & Co.

VI. For error of law in concluding that under the terms of McDill's suretyship to the bank, as shown by a similar bond, Exhibit "D D," to wit: That the principal was to pay "the full and just sum of any overdrafts that he may make upon his account as kept at said Exchange Bank during the cotton season just opening, as soon as the balance is properly struck, and the demand for payment of same is made upon" the principal; "the bank cannot be said to have been damaged by 'any overdraft on the account of J. W. P. Hope & Co. during the cotton season just opening,' " because the recovery against Hubbard, Price & Co. satisfied all such damage, if any there was.

VII. For error of law in finding that by the terms of the contract between the bank and Hope & Co. and McDill, the bank was to apply the proceeds of the drafts on Hubbard, Price & Co. to the open cotton account of Hope & Co. for the year 1891, and error of law in holding that the bank was bound to so apply the proceeds, and not holding that there was no such obligation on the part of the bank, and that it had the right to apply them otherwise. And in this connection for error of law in holding, at least by implication, that the opinion of the liquidator expressed to McDill could bind the bank, or should in any way settle against it the conclu-

sion reached that by the terms of the contract with Hope and McDill, the bank was bound to apply the Hubbard, Price & Co. recovery to the open account of Hope & Co.

VIII. For error of law in failing to find that under the terms of the contract with the bank, the bank, in the absence of direction by Hope & Co. to apply the proceeds of the Hubbard, Price & Co. drafts to the open account, had the right to apply the proceeds thereof to any indebtedness of Hope & Co. to the bank.

IX. For error of law in failing to find that Hope & Co. had lost their right to direct application of proceeds of the Hubbard, Price & Co. judgment, when by the terms of the compromise with the bank Hope & Co. had allowed full benefit of the recovery, if any, to be retained by Exchange Bank; and that McDill could not, by reason of his suretyship, give contrary directions.

X. For error of law in confirming the report of the referee in recommending that the complaint be dismissed.

XI. For error of law in failing to grant the prayer of the complaint.

*Messrs. Witherspoon & Spencer,* for appellants, cite: *Mc-Dill had no enforceable equity:* 22 S. C., 284.

*Mr. W. W. Lewis,* also for appellants, cites: *Notes taken not as payment but as evidence of amount due on account:* 21 S. C., 126; 22 S. C., 290. *Contract must be construed in same way as to principal and surety:* 22 S. C., 290. *Funds coming into bank without direction could be applied by bank to any indebtedness of Hope:* 12 S. C., 37; 20 S. C., 46, 549; 22 S. C., 290.

*Messrs. Wm. B. McCaw* and *Finley & Brice,* contra.

March 19, 1900.    The opinion of the Court was delivered by

MR. JUSTICE JONES. The mortgage sought to be foreclosed in this action was executed May 12, 1893, by McDill

to secure a note made September 25th, 1891, for $2,000 to the Exchange Bank by J. W. P. Hope & Co. and J. N. Mc-Dill, the latter being surety. The note had been given in substitution for a bond previously executed by the parties, which was conditioned "to pay the full amount of any over-drafts that Hope & Co. may make upon their accounts as kept at said Exchange Bank during the cotton season just opening, as soon as the balance is properly struck and de-mand for payment is made." The Circuit Court concurring with the referee in his conclusions of law and fact, dismissed the complaint, on the ground that by a proper application of the assets or money of the principal debtor in the hands of the bank, there was no real overdraft for which the surety, McDill, was liable. Reference may be had to the decree of the Circuit Court and appellants exceptions thereto for a more detailed statement of the conclusions of the Circuit Court and the objections thereto.

We overrule the exceptions made and affirm the decree below. While little can be added in vindication of the de-cree, we will venture a few observations. The bank kept a "cotton account" for the season involved, and the books of the bank show on their face overdraft by Hope & Co. to the amount of $4,188.06. This was brought about, however, by debiting Hope & Co.'s account with $8,150, the amount of drafts by Hope & Co. on Hubbard, Price & Co. in refer-ence to the cotton business, which had been deposited with the bank for collection, but had been dishonored by Hubbard, Price & Co. These drafts represented the proceeds of cot-ton shipped by Hope & Co. to Hubbard, Price & Co. during that season. They were retained in the possession of the bank, and, though dishonored, with whatever liability at-tached thereon against Hubbard, Price & Co., became securi-ties of the principal debtor in the hands of the creditor appli-cable to the cotton account for which the surety was liable. In a suit against Hubbard, Price & Co. based on these drafts, the bank recovered the full amount of the drafts, with interest, and after deducting all expenses, the balance is more

than sufficient to cover the alleged overdraft. The bank, however, claims the right, in the absence of any direction by the debtor, to apply the proceeds of these overdrafts to another obligation of Hope & Co. with which the surety, McDill, is not concerned, leaving only a balance of $1,297.60, which was applied by the bank to the cotton account. We think it clear that the surety has an enforceable equity requiring the proceeds of these drafts to be first applied in exoneration of his liability. The liability of Hubbard, Price & Co. in reference to the cotton transactions between Hope & Co. and the bank, based on the dishonored drafts, was a security of the principal debtor in the hands of the creditor, appertaining to the debt for which the surety was liable, and the proceeds could not be diverted to the injury of the surety without his consent or waiver. We find nothing in the case to warrant a conclusion that the surety has ever consented to such application, or that he has ever waived his right to be exonerated by the recovery against Hubbard, Price & Co. That the drafts against Hubbard, Price & Co. in fact belonged to and were a part of the "cotton account" of Hope & Co. with the bank is clearly shown by the bank's own action in entering them on their books in said account, in the suit to recover thereon against Hubbard, Price & Co., and in the congratulations by the bank liquidator to the surety after the recovery on the sureties' release by reason of the recovery. These claims against Hubbard, Price & Co. being factors in the "cotton account," they must be considered in determining whether there was in fact any real overdraft on said account. There was in fact no real, permanent overdraft to the loss of the bank, for the bank was fully indemnified by the recovery against Hubbard, Price & Co. Had the drafts against Hubbard, Price & Co. been promptly paid, no one would contend that the bank could have diverted the proceeds to a different obligation of Hope & Co. to the prejudice of the surety, and we cannot see how the bank, without the surety's consent, can acquire a right to a different application merely because the payment was delayed and

had to be enforced.    This case is easily distinguished from *Pelzer, Rodgers & Co.* v. *Steadman,* 22 S. C., 284, which is relied on by appellants.    In that case the creditor was allowed to apply to an old debt of the principal debtor the proceeds of cotton shipped to the creditor by the principal debtor, instead of applying the same to the contract for advances for which the surety was liable.    The contract of the surety, as construed by the Court in that case, was to pay $2,000, with interest and commissions, by November 1, 1881, and also that the principal would ship all cotton to Pelzer, Rodgers & Co., not for the payment of the $2,000, not as additional and collateral security thereto, but to sell on commission.    So the Court held there was no appropriation of the cotton to the advance of $2,000 secured by the mortgage of the surety, concluding in this language: "Hence, in plaintiffs failing to thus apply it (the cotton to the advances), it cannot be said that they have changed, altered or modified the contract, or that they have diverted to other purposes securities or collateral deposited or pledged by the debtor for its enforcement, to the injury of the surety, or that they have violated any other recognized equity of the surety."    The law implies a contract by the creditor that the surety shall have the benefit of all securities or collateral of the principal debtor held by the creditor for the enforcement of the debt for which the surety is liable, and in this case the creditor is seeking to divert to other purposes securities of the principal debtor pledged for the discharge of the debt sought now to be enforced against the surety.

The judgment of the Circuit Court is affirmed.